**JEFFERSON COUNTY,**
Texas, Appellant

v.

**Noryour AKINS, Appellee**

**NO. 09–14–00017–CV**

Court of Appeals of Texas,
Beaumont.

Submitted on November 10, 2014

Opinion Delivered February 25, 2016

Corey J.H. Crenshaw, Criminal Dist. Atty., Philip Babin, III, Asst. Dist. Atty., Beaumont, for Appellant.

Marc Henry, Henry & Fuller, Beaumont, for Appellee.

Before McKeithen, C.J., Kreger and Johnson, JJ.

## OPINION

CHARLES KREGER, Justice

Noryour Akins sued Jefferson County for injuries she sustained when she slipped and fell while in a common hallway of the Jefferson County Jail. A jury found in Akins's favor, awarded damages, and the trial court signed a judgment based on the jury's verdict. Jefferson County appeals from the final judgment and in three issues, contends there was insufficient evidence to support the jury's findings and thus, the trial court erred by denying its

motion for judgment notwithstanding the verdict and motion for new trial. We affirm the trial court's judgment.

## I. Background

On March 16, 2010, Akins, a Mid–State Services, Inc. employee working at the Jefferson County Jail, slipped and fell while leaving the jail after her shift ended. At trial, Akins testified that at the time of her accident, she was in control of the kitchen area of the County jail and supervised between eight and twenty-two inmates in food preparation for the facility. On the day of the accident, Akins's shift began at 1 a.m. She supervised her crew that morning in the preparation and service of breakfast to the officers, which was served at 4:30 a.m. in the officers' dining room. Akins and her crew were also responsible for preparing and delivering breakfast trays to prisoners being booked into the inmate population. That morning they delivered all of the book-in trays before 4:30 a.m. Akins explained that her crew prepares the book-in trays and then places the trays on rolling carts, which they then roll out of the kitchen, through the officers' dining room, and down the hallway to the book-in area. The following diagram was admitted into evidence.

Akins admitted that when there was water on the trays, the water would drip from the trays, down the cart, and onto the floor. She testified the kitchen usually needed two or three carts each morning to deliver the book-in meal orders.

After serving breakfast, Akins supervised her crew in preparing for other meals until her shift ended. In preparing to leave for the day, Akins picked up her backpack and exited the kitchen through the officers' dining room, passing in front of the steam table. As she crossed the

threshold exiting from the officers' dining room to the hallway, Akins noticed Yvonne Scott, a Jefferson County employee, to her left approximately fifteen to twenty feet down the hallway from the doorway. Akins testified that she saw Scott supervising her crew mopping the hallway floor. Akins testified that she spoke to Scott as she walked through the doorway and then her foot hit something slippery on the floor. The "next thing [she knew, she] was on the floor." Her feet had slipped out from under her. After she had fallen, she noticed that her back was wet, but did not know what substance was on the floor that caused her back to become wet. Akins recalled seeing something "shiny" on the floor by Scott's crew. Scott came over and advised her not to move, and then Scott called for help.

Lori Siddle was Akins's direct supervisor on the day of the accident and worked the shift immediately after Akins the day of the accident. Siddle was present that morning and was approximately three to five seconds behind Akins and saw Akins fall. It was Siddle's opinion that Scott had mopped the area in which Akins had fallen because when Siddle looked down at the floor, it was damp and appeared to have been mopped. According to Siddle, the only other people in the immediate area were Scott and her crew.

Yvonne Scott testified that on the day of the accident, her crew was working in the book-in area. Her crew mopped that area of the facility multiple times each day. She testified that there was a "slippery floor" sign on the mop bucket her crew was using. It was her practice to dry-mop each area after it was mopped because she did not want to leave the floor wet for safety concerns.

Contrary to Akins's testimony, Scott recalled that she was standing close to the doorway leading into the officers' dining room, approximately one foot away from where Akins fell. She explained that she was standing in that location so she could warn people to be careful when they entered the book-in area of the hallway while her crew was mopping. It was her testimony that her crew had mopped up to the point in the hallway where she was standing. Scott denied though, that her crew had mopped the area where Akins fell. According to Scott, the area in which she was standing was not damp or wet.

According to Scott, she did not immediately notice any water on the floor where Akins fell. Despite this claim, Scott admitted that she scolded her crew immediately after Akins fell because she thought they had mopped the area and left it wet, causing Akins to fall. Scott explained that Akins's fall had been traumatic and she knew that Akins had fallen for a reason, so she assumed her crew was at fault and scolded them. In a written statement Scott prepared after the incident, she stated that her "trusties were drying the area again when [she] noticed drops of water on the floor in the doorway of [the officers' dining room], as well as inside of [the officers' dining room]."

In a second typewritten statement made almost nine months after the incident, Scott explained that after Akins fell, Scott looked to see if the area was wet and discovered only droplets of water leading from the kitchen door, through the officers' dining room, down the book-in hallway, and up to the book-in desk. However, on cross-examination, Scott admitted that she had not included this detail in her first handwritten statement made on the day of the incident. Scott opined that the water came from the kitchen carts. She explained that it was common knowledge that the trays placed on the carts were dripping wet, which caused the carts to drip water from the kitchen, through the

officers' dining room, and down the hall to the book-in area. She testified that it would have been the kitchen staff's responsibility to take care of the water from the carts.

Scott identified an additional circumstance that could cause the floors in the area to become slippery. Scott explained that the kitchen floor stayed wet. Scott's office was located near the kitchen and in order for her to visit the different areas in the jail from her office, she had to walk through the kitchen, taking the same path Akins took the day she fell. Scott explained that every time she walked through the kitchen, the bottom of her feet got wet so that when she crossed the threshold from the kitchen into the officers' dining room, her feet remained wet. However, she denied seeing a skid mark of water on the floor on the day of the accident.

Akins acknowledged that the kitchen floor stays wet and occasionally has standing water. Akins admitted that when she exited the kitchen, her feet were always wet and there was nothing between the kitchen and the officers' dining room for people to dry the bottom of their feet. Because the floor in the kitchen was always wet, Akins's employer required all kitchen staff to wear either rubber boots or non-skid shoes. Akins recalled that on the day of the accident, she wore non-skid tennis shoes because she knew she had to walk on wet floors during her shift.

Akins admitted that part of her job was to identify slippery floors and to take steps to make the floors safe. Part of her responsibility included supervising her crew in cleaning the kitchen area and dining rooms, which included mopping. Akins testified that because her crews only used a damp mop, they did not need to dry-mop afterwards. Akins agreed it was her job to keep the officers' dining room clean and

the floors dry. She testified that the officers' dining room has the same tile flooring as the hallway, but she and her crew worked primarily behind the steam table, and that area was covered with a mat. Akins maintained that when she exited the officers' dining room on the morning of her fall, the bottom of her feet were not wet.

Julie Dike, a medical contractor at the facility, testified that she was the first medical personnel to attend to Akins after she had fallen. Dike recalled seeing "a little bit of water" on the floor and thinking Akins had slipped. According to Dike, the water she saw appeared to be a streak from Akins's shoe. Dike acknowledged that there was nothing to dry a person's feet on exiting from the wet kitchen and entering the officers' dining room, but testified that the dining room was kept clean and dry. When she arrived to care for Akins, she saw Scott's cleaning crew standing down the hall from where Akins had fallen. She did not remember whether there were any signs in the area where Akins had fallen that stated the floor was wet.

After Akins fell, an ambulance transferred her to a hospital. Once at the hospital, Akins recalled having pain in her head, neck, and back. She was released from the hospital with instructions to seek additional medical care for her injuries, which she did. At the time of trial, Akins continued to suffer with lower back problems, neck pain, and headaches, and she continued to receive treatment for her conditions. According to Akins, her treating physicians had not released her to return to work at the time of trial.

Jeff Theriot testified he has been employed as the assistant deputy chief at the jail for over twenty years. Theriot explained that cleanliness in the jail is important because of the various types of diseases and illnesses brought in by the

inmates. To achieve the standard of cleanliness required, the jail staff mops continuously. As a result, it is common to have damp floors at the facility. He testified that dry-mopping is optional and is not required by the facility's policies. The facility's policy does require a "wet floor" sign placed in the area of wet floors to warn others of the water. Theriot did not dispute that Akins fell at the facility, but did note that Akins is the only person to have ever reported a slip and fall at this facility resulting from the mopping of the floors.

At the conclusion of all of the evidence, the jury returned a verdict in Akins's favor, finding that: (1) the County's negligence proximately caused the occurrence in question; (2) the County was one hundred percent responsible for the occurrence or injuries Akins sustained; and (3) Akins suffered actual damages of $353,044.76. The County filed a motion for judgment notwithstanding the verdict. After an oral hearing on the County's motion, the trial court entered judgment on the verdict and pursuant to section 101.023 of the Texas Civil Practice and Remedies Code, limited Akins's damages recovery to $100,000, plus post-judgment interest, and costs. *See* Tex. Civ. Prac. & Rem.Code § 101.023 (West 2011). The County filed a motion for new trial, which the trial court denied. The County appealed.

## II. Sufficiency of the Evidence

In three issues, the County argues the evidence is legally and factually insufficient to support the jury's findings. In its first issue, the County contends there was no evidence or insufficient evidence to support the jury's findings that (1) the condition of the floor created an unreasonable risk of harm; (2) the County had actual knowledge of the dangerous condition; (3) Akins did not have actual knowledge of the dangerous condition; and (4) the County failed to use ordinary care to protect Akins from the dangerous condition. In its second issue, the County argues that the jury's finding that Akins shared no proportion of responsibility [1] for her injuries was factually insufficient because the finding was against the great weight and preponderance of the evidence.[2] In its second issue, the County also argues that there is no evidence or insufficient evidence to support the jury's finding that Akins's medical expenses for her narcotic pain medication were reasonable and necessary expenses. Because the County failed to preserve its legal sufficiency challenge to this issue, we will only review the jury's finding for factual sufficiency. *See* Tex.R.App. P. 33.1(a). In its third issue, the County contends that because the evidence was legally and factually insufficient to support the jury's findings, the trial court erred in denying its post-trial motions.

---

1. In its second issue, the County specifically complains of the jury's finding of "no contributory negligence as to Akins[.]" We note that the affirmative defense of contributory negligence no longer exists under Texas law, having been replaced by the Legislature with the proportionate-responsibility statute. *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 209–10 (Tex.2015). We construe the County's second issue as challenging the factual sufficiency of the jury's finding that Akins shared no proportion of responsibility for her injuries.

2. The County also characterizes its argument as to the jury's finding of no proportionate responsibility as a no evidence and insufficient evidence challenge. However, the County had the burden of proof on this defensive theory at trial, so we will only review its complaints as a factual sufficiency challenge claiming the jury's finding is against the great weight and preponderance of the evidence. *See id.* at 210.

■ "[When] an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding." *Univ. Gen. Hosp., L.P. v. Prexus Health Consultants, LLC,* 403 S.W.3d 547, 550 (Tex.App.–Houston [14th Dist.] 2013, no pet.). In a legal sufficiency review, we review the evidence in the light most favorable to the appealed finding and indulge every reasonable inference that supports the finding. *Id.* at 550–51. We will find the evidence legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We will credit favorable evidence if a reasonable trier of fact could, and disregard contrary evidence unless a reasonable trier of fact could not. *Id.* at 807, 827. The trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.* at 819. We will sustain a legal sufficiency challenge (no evidence challenge) only if the record shows: (1) the complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810.

■ In evaluating a factual sufficiency (insufficient evidence) challenge, we consider and weigh all of the evidence, not just the evidence that supports the finding. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998). If the challenging party did not have the burden of proof at trial on the challenged finding, then we will "set aside the verdict only if the evidence that supports the finding is so weak as to make the verdict clearly wrong and manifestly unjust." *City of Austin v. Chandler,* 428 S.W.3d 398, 407 (Tex.App.–Austin 2014, no pet.) (citing *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam)). If the challenging party did have the burden of proof at trial, the challenging party must demonstrate on appeal that the adverse finding is "so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001). The jury is the sole judge of the witnesses' credibility as well as the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003).

### III. Premises Liability

■ In a premises-liability case, the duty owed to the plaintiff, if any, depends on the status of the plaintiff as an invitee, licensee, or trespasser. *See Scott & White Mem'l Hosp. v. Fair,* 310 S.W.3d 411, 412 (Tex.2010); *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005); *Motel 6 G.P., Inc. v. Lopez,* 929 S.W.2d 1, 3 (Tex.1996).

■ A governmental unit is liable for personal injury and death caused by a condition of real property "if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem.Code Ann. § 101.021(2). For ordinary premises defects, the Code limits the governmental unit's duty to "the duty that a private person owes to a licensee on private property[.]" *Id.* § 101.022(a). "Thus, a governmental unit may be liable for an ordinary premises defect only if a private person would be liable to a licensee under the same circumstances." *Cty. of Cameron v. Brown,* 80 S.W.3d 549, 554 (Tex. 2002). Here, Akins's legal status as a licensee is not in dispute. The County's legal status as a governmental unit and as

the possessor of the premises is also undisputed.

Generally, a possessor of property owes a licensee the duty not to willfully, wantonly, or with grossly negligent conduct, cause injury to a licensee. *Id.* Akins did not allege that the County breached this duty of care. Rather, Akins alleged and argued at trial that the County failed to warn her of a dangerous condition that created an unreasonable risk of which the County was aware and she was not.

When a governmental unit has actual knowledge of a dangerous condition and the licensee does not, the governmental unit has a duty to exercise ordinary care to either warn the licensee of the condition or make the condition reasonably safe. *City of Denton v. Paper,* 376 S.W.3d 762, 766 (Tex.2012); *Brown,* 80 S.W.3d at 554. Thus, for a licensee to recover on a premises liability claim for breach of this duty, Akins must prove that: (1) a condition on the premises posed an unreasonable risk of harm; (2) the property possessor had actual knowledge of the condition; (3) the licensee did not have actual knowledge of the condition; and (4) the property possessor breached its duty of ordinary care by either failing to warn of the condition or failing to make the condition reasonably safe. *See Brown,* 80 S.W.3d at 554.

## A. Unreasonable Risk of Harm

The County first challenges the jury's finding that there was a condition that posed an unreasonable risk of harm and the trial court's submission of the issue to the jury. A condition that presents "an unreasonable risk of harm" is "one in which there is a sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen." *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 754 (Tex.1970); *see also Brown,* 80 S.W.3d at 556. The foreseeability requirement does not require the exact sequence of events that produced the injury be foreseeable, but only that the general danger be foreseeable. *Brown,* 80 S.W.3d at 556. In determining whether a condition posed an unreasonable risk of harm, courts have considered various factors, including: (1) whether the condition was clearly marked; (2) whether any injuries had occurred in the past; (3) whether any other invitees had complained about the condition; (4) whether the condition was unusual as compared to other conditions in the same class; and (5) whether the condition met applicable safety standards. *Martin v. Chick–Fil–A,* No. 14–13–00025–CV, 2014 WL 465851, at *3–4 (Tex.App.–Houston [14th Dist.] Feb. 4, 2014, no pet.) (mem. op.); *see also Seideneck,* 451 S.W.2d at 754.

The County argues that the alleged condition did not create an unreasonable risk of harm because "[m]opping accidents in the jail cannot possibly be described as 'probable' after it took twenty years of mopping at least twice [a] day under the feet of a thousand people to have the first and only injury." However, evidence of other falls or lack thereof are only probative and not conclusive of the issue of whether the condition posed an unreasonable risk of harm. *See Hall v. Sonic Drive–In of Angleton, Inc.,* 177 S.W.3d 636, 646 (Tex.App.–Houston [1st Dist.] 2005, pet. denied); *see also Seideneck,* 451 S.W.2d at 754.

A number of Texas courts have found that indoor wet floors can pose an unreasonably dangerous condition. *See, e.g., Brookshire Grocery Co. v. Taylor,* 222 S.W.3d 406, 407, 409 (Tex.2006) (holding that partially melted ice on the floor origi-

nating from a soft drink dispenser is an unreasonably dangerous condition); *City of San Antonio v. Rodriguez*, 931 S.W.2d 535, 536 (Tex.1996) (overruling a lower court's holding that a leaky roof was a dangerous condition, but noting that the city was required to prevent the leaking water from causing a dangerous condition on the floor of an indoor basketball court); *Rosas v. Buddie's Food Store*, 518 S.W.2d 534, 537–38 (Tex.1975) (holding that a wet entryway caused by customer foot traffic and windblown water may be an unreasonably dangerous condition when there is evidence of past customers falling on a wet floor adjacent to the entryway and the store having procedures for handling such occurrences); *Wal–Mart Stores, Inc. v. Sparkman*, No. 02–13–00355–CV, 2014 WL 6997166, at *3 (Tex.App.–Fort Worth Dec. 11, 2014, pet. filed) (mem.op.) (overruling premises owner's argument that a wet entryway was not an unreasonably dangerous condition when it resulted from rainwater unnaturally accumulating on an indoor concrete floor treated with a shiny sealant that prevented customers from being able to see the accumulated water); *Duprie v. Dolgencorp of Tex.*, 59 S.W.3d 196, 198–99 (Tex.App.–Beaumont 2000, pet. denied) (implying wet floors caused by customers' tracked-in water was an unreasonably dangerous condition).

■ Here, it is undisputed that Akins slipped on the floor inside the facility. However, the parties dispute the circumstances that created the slippery floor. Akins testified that she was uncertain what substance caused the floor to be slippery, but she recalled that after she fell, her back was wet. Based on the circumstances surrounding her accident, Akins argued at trial that she slipped on mop water left by Scott's crew on the hallway floor. Akins saw Scott and Scott's crew mopping an area about twenty feet down

the hallway from where she fell. While Scott admitted that her crew had mopped up to the point where she was standing, that point, according to Scott, was within one foot of where Akins fell. It was part of Scott's responsibility to mop the hallway multiple times each day. Siddle testified that after Akins fell, Siddle looked at the floor and it appeared damp and to have been mopped. Dike also recalled seeing water on the floor.

While Scott denied that her crew had mopped the area in which Akins fell, she admitted that immediately after the accident, she scolded her crew for leaving the floor wet. Scott testified that she had scolded them, essentially as a knee-jerk reaction to what had occurred and not because they actually did anything wrong. The jury could have disbelieved Scott's explanation and instead believed that Scott scolded her crew because they had, in fact, left the floor wet. The jury also heard testimony that Scott made a written statement the day of the accident wherein she stated that after Akins had fallen she had her crew dry the area "again" when she noticed drops of water on the floor in the doorway of the officers' dining room. Scott testified that her written statement should not be interpreted as indicating the crew dried the area in which Akins fell a second time, because her comment was actually in reference to the crew drying the book-in area a second time. The jury could have rejected Scott's explanation and believed that her crew left water on the floor, and Scott directed them to dry-mop that area a second time after the accident.

The undisputed evidence in the record is that no one in the County jail had ever reported slipping and falling on damp or wet floors in the County jail stemming from the County's mopping procedure. However, as discussed above, this fact is only probative, and not conclusive of this

issue. The jurors could have inferred from the testimony that there had been no prior accidents because Scott's self-imposed, routine practice of dry-mopping the floors had prevented such accidents. The jury could have concluded that Scott failed to direct her crew to dry-mop the area in question on this day, or that she failed to ensure that they had thoroughly dry-mopped the area before moving down the hallway, leaving the floors damp or wet. Viewing the evidence in a light most favorable to the jury's finding, we conclude there is more than a scintilla of evidence supporting the jury's finding and that reasonable and fair-minded people could reach the conclusion that the floor was wet or damp and that a wet or damp tiled floor posed an unreasonable risk of harm. *See Wilson,* 168 S.W.3d at 810, 827. After reviewing all the evidence, we conclude the evidence is not so weak as to make the verdict clearly wrong and manifestly unjust. *See Chandler,* 428 S.W.3d at 407. We conclude the evidence is legally and factually sufficient to support the jury's finding that a condition at the facility posed an unreasonable risk of harm and overrule the County's challenge to this issue.

### B. The County's Knowledge of Condition

The County contends the evidence is legally and factually insufficient to show that it had actual knowledge that the alleged condition of the floor was a danger at the time of the accident. To recover on her claim, Akins must show that the County had "actual knowledge" of the dangerous condition at the time of the accident. *See City of Corsicana v. Stewart,* 249 S.W.3d 412, 413–14 (Tex.2008). This element requires evidence that the County knew that the dangerous condition existed at the time of Akins's fall and not merely knowledge of the possibility that a danger-

ous condition could develop over time. *See City of Dallas v. Thompson,* 210 S.W.3d 601, 603 (Tex.2006). "[H]ypothetical knowledge of a dangerous condition" is not "actual knowledge[.]" *Univ. of Tex. at Austin v. Hayes,* 327 S.W.3d 113, 117 (Tex. 2010). Actual knowledge is not constructive knowledge, which can be established by facts or inferences to show that a dangerous condition could develop over time. *Stewart,* 249 S.W.3d at 414–15. A claimant cannot establish actual knowledge by piling inference upon inference. *Am. Indus. Life Ins. Co. v. Ruvalcaba,* 64 S.W.3d 126, 142 (Tex.App.–Houston [14th Dist.] 2001, pet. denied). Proof that a premises owner created a condition that poses an unreasonable risk of harm may constitute circumstantial evidence that the owner knew of the condition, but does not establish knowledge as a matter of law. *Keetch v. Kroger Co.,* 845 S.W.2d 262, 266 (Tex. 1992). Thus, any inference of actual knowledge stemming from the premise owner's creation of the dangerous condition is a question of fact for the jury. *See id.*

Akins presented evidence that Scott, a Jefferson County employee, supervised a work crew in mopping the hallway floor, thereby causing the floor to become wet. There was evidence that Scott was standing in the area to supervise the crew and to warn people of the wet floor. While Akins recalled Scott being farther from the doorway, Scott testified that she was standing within a foot of the doorway and that her crew had mopped up to the point where she was standing. While Scott denied that her crew had mopped the area where Akins actually fell, the jury could have discredited this testimony based on Scott's initial reaction in scolding her crew for leaving the floor wet, Scott's statement made directly after the fall, Siddle's testimony that the floor appeared to have just

been mopped, and Scott's statement that she had her trusties dry mop the area "again." Akins also produced testimony that Scott was aware that wet floors posed a safety risk. One of the chief officers at the facility testified that the jail was mopped continuously and it was not unusual for mopped floors to be damp. The County also had a policy requiring kitchen staff to wear non-skid shoes or boots, acknowledging the County's awareness that damp floors generally pose safety concerns.

The County's evidence included testimony that there had been no accidents involving people slipping and falling due to wet-mopped floors in over twenty years. The County produced evidence that while damp, wet floors are common in the jail, they have never been a problem in the past. The County also produced evidence to show that Akins, and not Scott, had caused the floors to become wet. However, the jury was free to disbelieve Scott's testimony that her crew had not mopped the floor and to believe instead that the mopping crew left the floor wet and that Scott was aware of this condition, which is why she reacted so strongly when Akins fell and had them dry-mop the area afterwards.

Viewing the evidence in a light most favorable to the jury's finding, we conclude there is more than a scintilla of evidence to support the jury's finding and that reasonable and fair-minded people could reach the conclusion that the County had actual knowledge of the dangerous condition at the time of the accident. *See Wilson,* 168 S.W.3d at 810, 827. We further conclude that in viewing all the evidence, it is not so weak as to make the verdict clearly wrong and manifestly unjust. *See Chandler,* 428 S.W.3d at 407. We therefore conclude that the evidence is legally and factually sufficient to support the jury's finding that

the County had actual knowledge of the dangerous condition at the time the accident occurred. We overrule the County's challenge of this issue.

## C. Akins's Knowledge of the Condition

The County also argues that the evidence is legally and factually insufficient to show that Akins did not have actual knowledge of the dangerous condition. "If a licensee is aware of a dangerous condition, he has all that he is entitled to expect, that is, an opportunity for an intelligent choice as to whether the advantage to be gained by coming on the land is sufficient to justify him in incurring the risks involved." *Brown,* 80 S.W.3d at 557–58. Therefore, to recover on a premises defect theory, "a licensee must prove that he did not know of the dangerous condition[.]" *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 237 (Tex.1992). A licensee has actual knowledge of the condition if the condition was perceptible to her or if she could infer the condition's existence from facts within her present or past knowledge. *See Wal-Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex.2003) (quoting *Lower Neches Valley Auth. v. Murphy,* 536 S.W.2d 561, 564 (Tex.1976)); *see also Osadchy v. S. Methodist Univ.,* 232 S.W.3d 844, 852 (Tex. App.–Dallas 2007, pet. denied).

The County contends that Akins knew she was walking on a damp floor because Akins testified that she observed active mopping and a wet floor within fifteen feet of where she fell. During her trial testimony, Akins admitted that she saw Scott and her crew mopping the hallway approximately fifteen to twenty feet from where Akins fell. However, that Akins observed mopping and a shiny floor twenty feet away is not evidence that she knew the floor directly in front of her had been mopped and was also wet. In fact, Akins

testified that she did not see anything wet on the floor when she slipped and fell. The County also contends that Akins knew her shoes were wet when she entered the officer's dining room from the wet kitchen approximately fifteen feet from where she fell. However, Akins testified that her shoes were not wet when she entered the hallway in which she fell.

The County argues that Akins had expertise in recognizing and addressing floor hazards, including slippery floors caused by mopping. Akins testified that it was part of her job training and responsibility to identify and correct slippery floors in her work area. Akins's work area did not generally extend to the hallway. However, she acknowledged that her responsibilities included traversing the hallway to deliver food trays to the book-in area of the facility and that she had supervised the delivery of those trays at approximately 4:30 a.m. that morning. She also acknowledged that the carts that carried the trays often dripped water onto the floor. Akins testified that if her crew dripped water on the floor in the hallway during this process, it was her responsibility to make sure her crew cleaned it up immediately to prevent falls. Other than cleaning up after the carts, it was not Akins's responsibility to identify and remedy floor hazards in the hallway. Akins testified that they delivered the book-in trays approximately four hours before she fell. As such, when Akins's shift was over and she stepped out into the hallway to leave, she contended it was not her job responsibility or duty to observe the floor in that area for hazards.

There was evidence that the hallway is mopped frequently. However, Akins's awareness that the hallway floor might possibly be wet because it is frequently mopped is not the same as actual knowledge that the floor was wet when she stepped over the threshold on the day of the accident. Encountering wet floors from mopping operations throughout the facility is a transient condition, as opposed to the known condition of the kitchen floor, for instance, which remained wet all of the time. In fact, Scott testified that it was her practice to have her crew dry-mop over all mopped areas. If Scott did routinely practice dry-mopping, then typically the floor would be dried immediately after it was mopped so that Akins would not have expected the floor to be wet. At most, Akins's past and present knowledge could only allow her to infer that the floor might possibly be wet due to mopping. However, it was her further experience that if the floor had been left damp, there would have been a sign in that area to warn her of that condition. Thus, because of the transient nature of the mopping of the facility in general, the evidence does not conclusively establish that Akins was aware of the dangerous premises condition so that the County owed her no duty to warn her. *See Wal–Mart*, 102 S.W.3d at 709 ("In other words, a licensor owes no duty to a licensee so long as the evidence conclusively establishes the licensee perceived the alleged dangerous condition.").

Viewing the evidence as we are charged in a light most favorable to the jury's finding, we conclude the evidence is more than a scintilla and that reasonable and fair-minded people could reach the conclusion that Akins did not have actual knowledge of the dangerous condition. *See Wilson*, 168 S.W.3d at 810, 827. We further conclude the evidence is not so weak as to make the verdict clearly wrong and manifestly unjust. *See Chandler*, 428 S.W.3d at 407. The evidence is legally and factually sufficient to support the jury's finding that Akins did not have actual knowledge of the dangerous condition at the time of the accident. We overrule the County's challenge on this issue.

## D. The County's Failure to Exercise Ordinary Care

When a possessor of property has actual knowledge of a dangerous condition and the licensee does not, the possessor owes a duty either to warn the licensee of the danger or to make the condition reasonably safe. *State v. Williams*, 940 S.W.2d 583, 584 (Tex.1996). As discussed above, the County owed a duty to warn or make the premises reasonably safe for Akins, a licensee. The County argues the evidence is legally and factually insufficient to support the jury's finding that it breached this duty by failing to exercise ordinary care to protect Akins. In support of its contention, the County argues that Akins observed the mopping crew and the wet floor prior to her fall. The County also argues that it adequately warned Akins of the danger. Akins responds that she did not see the mopping crew or sign until the moment she fell, explaining that she slipped and fell as she stepped through the door and simultaneously saw the sign and the mopping crew to her left. Akins essentially contends that the evidence is sufficient to support the jury's finding that the sign on the mop bucket was inadequate to warn her of the danger.

The evidence in the record supports that the only warning sign posted in the area was located on a mop bucket twenty feet from where Akins entered the hall and fell. It is reasonable that a licensee entering the hallway would not have seen the warning sign in time to react to the dangerous condition. There is no substantive description in the record regarding the size or color of the warning sign or the font used on the sign. The only description is that it was a "slippery floor" sign posted on a mop bucket. A reasonable jury could conclude based on all of the circumstances surrounding Akins's fall that the warning sign posted approximately twenty feet from the wet floor where Akins fell was inadequate to warn Akins of the slippery condition on the floor when she entered the hallway. Viewing the evidence in a light most favorable to the jury's finding, we conclude the evidence is sufficient to support the jury's finding that the warning sign was not adequate in this circumstance to warn Akins of the wet floor. *See Wilson*, 168 S.W.3d at 810, 827. After reviewing the entire record, we conclude the evidence is not so weak as to make the verdict clearly wrong and manifestly unjust. *See Chandler*, 428 S.W.3d at 407. We overrule the County's challenge of this element.

Having overruled the County's challenges to the jury's finding that Jefferson County's negligence proximately caused the occurrence in question, we overrule the County's first issue.

## IV. Apportionment of Responsibility

In its second issue, the County maintains that the evidence was factually insufficient to support the jury's finding that Akins shared no responsibility for her injuries. The jury found that the County was one-hundred percent responsible for causing the injuries to Akins. The County maintains that the great weight and preponderance of the evidence militates in favor of a fault allocation against Akins. The County bases this argument on a number of factors, including its contention that the evidence conclusively establishes that Akins was in a better position to avoid the fall than the County's employee, Scott. The County also argues that Akins was trained and had experience to recognize and correct wet floor hazards. The County contends that Akins's testimony is that she actually observed the mopping and wet floor in the hallway where she slipped.

The jury is given wide latitude in performing its sworn duty to serve as the factfinder in allocating responsibility. *N. Am. Van Lines, Inc. v. Emmons,* 50 S.W.3d 103, 126 (Tex.App.–Beaumont 2001, pet. denied); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 33.003 (West 2015). "Even if the evidence could support a different percentage allocation of responsibility, an appellate court may not substitute its judgment for that of the jury." *Emmons,* 50 S.W.3d at 126; *Samco Props., Inc. v. Cheatham,* 977 S.W.2d 469, 478 (Tex.App.–Houston [14th Dist.] 1998, pet. denied).

There was evidence to support that a County employee left a tiled floor wet without adequate warning. There was also evidence that at the time Akins entered the hallway immediately before her fall, the mopping crew was no longer mopping in the area where Akins fell but was, instead, mopping twenty feet away down the hallway. Further, the jury could have inferred from the evidence that Akins did not see the mopping crew, the warning sign, or the shiny floor until after she began to fall or simultaneously therewith. Reviewing all of the evidence, we conclude there is sufficient evidence to support the jury's allocation of responsibility in its verdict. Thus, we conclude the evidence is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Francis,* 46 S.W.3d at 242. We overrule the portion of the County's second issue challenging the factually sufficiency of the evidence to support the jury's finding that Akins shared no responsibility for her injuries.

## V. Damages

The County argues there is factually and legally insufficient evidence to support the jury's finding as to the reasonableness and necessity of the medical expenses incurred by Akins. The County specifically challenges the jury's award for expenses related to Akins's narcotic pain medication. "When someone suffers personal injuries, the damages fall within two broad categories—economic and non-economic damages." *Golden Eagle Archery, Inc.,* 116 S.W.3d at 763. Economic damages compensate an injured party for lost wages, lost earning capacity, and medical expenses. *Id.* A plaintiff has the burden to prove the amount of medical expenses the plaintiff incurred and to establish that the expenses were reasonable and necessary for the injuries plaintiff sustained. *Nat'l Union Fire Ins. Co. v. Wyar,* 821 S.W.2d 291, 297 (Tex.App.–Houston [1st Dist.] 1991, no writ); *Monsanto Co. v. Johnson,* 675 S.W.2d 305, 312 (Tex.App.–Houston [1st Dist.] 1984, writ ref'd n.r.e.). "A plaintiff may prove medical expenses are reasonable and necessary either by presenting expert testimony, or by submitting affidavits in compliance with section 18.001 of the Texas Civil Practices and Remedies Code." *Jackson v. Gutierrez,* 77 S.W.3d 898, 902 (Tex.App.–Houston [14th Dist.] 2002, no pet.); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 18.001(b) (West 2015). Mere proof of the amounts charged or paid is not proof of reasonableness, and the recovery of medical expenses will be denied in the absence of showing the charges were reasonable and necessary. *See Jackson,* 77 S.W.3d at 903.

The jury awarded Akins $49,884.76 as damages to compensate Akins for reasonable expenses of necessary medical care incurred in the past. Akins presented expert testimony and affidavits to show that her medical expenses were reasonable and necessary. The County does not contend that the affidavits are not in compliance with section 18.001 or are otherwise deficient. *See* Tex. Civ.

Prac. & Rem.Code Ann. § 18.001(b). Section 18.001(b) provides:

> Unless a controverting affidavit is served as provided by this section, an affidavit that the amount a person charged for a service was reasonable at the time and place that the service was provided and that the service was necessary is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary.

*Id.* "An uncontroverted section 18.001(b) affidavit provides legally sufficient—but not conclusive—evidence to support a jury's finding that the amount charged for a service was reasonable and necessary." *Hong v. Bennett,* 209 S.W.3d 795, 800 (Tex. App.–Fort Worth 2006, no pet.). The County did not file a counter affidavit disputing the reasonableness or necessity of the medical expenses incurred by Akins.

 The County argues that the bulk of the past medical expenses awarded Akins stem either from a physician whose treatment allegedly made Akins worse and caused her to become addicted to narcotic pain medication, or from charges for the narcotics Akins used because of her addiction. The County contends that these expenses were not only unnecessary and unreasonable, but also harmful to Akins. However, "[i]t has long been an accepted and established [rule] in this State that one who wrongfully injures another is liable in damages for the consequences of negligent treatment by a doctor or surgeon selected by the injured person in good faith and with ordinary care." *Cannon v. Pearson,* 383 S.W.2d 565, 567 (Tex. 1964). The evidence supports that the narcotic pain medication was intended to treat injuries Akins sustained from the fall she suffered at the jail. Akins testified that she went to see this physician for treatment of her injuries related to the fall. She testified that she only used the narcotic pain medication as directed by her physician, and there is no evidence in the record to contradict her testimony. Another treating physician indicated that he believes that Akins's medical complaints are genuine and that she was honest with him. He testified that he believes Akins's complaints about her injuries are legitimate and not an attempt to obtain narcotics. That the doctor's chosen means of treating Akins may have been controversial, or even that it may be characterized as fraudulent or illegal, does not negate the fact that the treatment was intended to treat injuries Akins received from the fall. The evidence also supports that Akins sought treatment in a good faith attempt to have her injuries addressed. That Akins's treatment made her worse is one of the consequences the County reasonably should have anticipated as a probable result of the unreasonably dangerous condition. *See City of Port Arthur v. Wallace,* 141 Tex. 201, 171 S.W.2d 480, 483 (1943).

Viewing the evidence in a light most favorable to the jury's finding, we conclude the evidence is more than a scintilla and that reasonable and fair-minded people could reach the conclusion that Akins's medical expenses were reasonable and necessary. *See Wilson,* 168 S.W.3d at 810, 827. We further conclude the evidence is not so weak as to make the verdict clearly wrong and manifestly unjust. *See Chandler,* 428 S.W.3d at 407. We overrule the County's challenge of this issue.

For all the reasons stated above, we further conclude that the County has not demonstrated that the trial court erred by denying its motion for judgment notwithstanding the verdict and motion for new trial. We overrule the County's third issue on appeal.

Having overruled all of the County's issues on appeal, we affirm the judgment of the trial court.

AFFIRMED.

LEANNE JOHNSON, Justice, dissenting.

I respectfully dissent.

In the County's first appellate issue the County argues that the evidence is legally and factually insufficient to support the jury's finding in response to jury question one.[1] The County challenges the finding that there was an unreasonably dangerous condition, as well as the findings that the County had actual knowledge, that Akins did not have knowledge, and that the County failed to exercise ordinary care. The County also challenges the jury's finding in response to question two (assignment of percentage of fault) and three (damages). I would sustain the County's first appellate issue because the evidence is legally insufficient to support the jury's finding that Akins "did not have actual knowledge of the danger." I need not address the County's other arguments re-

---

**1.** There were no objections in the record to question one at trial and no complaints regarding the jury charge have been made on appeal. In a civil case, if there is no objection to the charge, the sufficiency of the evidence is measured by the law as actually given to the jury, not by the law as it should have been given. *See Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 715 (Tex.2001); *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000). Question one and the jury's response thereto were as follows:

Question 1

Did the negligence, if any, of those named below proximately cause the occurrence in question?

With respect to the condition of the premises, *Jefferson County,* Texas was negligent if—

1. *the condition* posed an unreasonable risk of harm, and

2. *Jefferson County, Texas* had actual knowledge of the danger, and

garding the remaining elements of jury question one, or the remaining appellate issues. *See* Tex.R.App. P. 47.1.

### Analysis

Under the Texas Tort Claims Act, a governmental unit is liable for "personal injury and death so caused by a condition or use of . . . real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem.Code Ann. § 101.021 (West 2011). In a premises-defect case, the governmental unit owes "only the duty that a private person owes to a licensee on private property[.]" Tex. Civ. Prac. & Rem.Code Ann. § 101.022(a) (West 2011).

As a general rule, a private premises owner owes a licensee the duty not to injure him by a willful or wanton act or through gross negligence while the licensee is on the owner's property. *State v. Tennison,* 509 S.W.2d 560, 562 (Tex.1974). There is an exception to the general rule if the owner has actual knowledge of the

---

3. *Noryour Akins* did not have actual knowledge of the danger, and

4. *Jefferson County, Texas* failed to exercise ordinary care to protect *Noryour Akins* from the danger, by both failing to adequately warn *Noryour Akins* of *the condition* and failing to make that condition reasonably safe.

"Negligence," when used with respect to Jefferson County, Texas also includes the negligence of its employees, agents and servants.

"Ordinary Care," when used with respect to the conduct of *Jefferson County, Texas* as an owner or occupier of a premises, means the degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances. Answer "Yes" or "No" for each of the following:

1. Jefferson County *Yes*

2. Noryour Akins *No*

dangerous condition on the property of which the licensee was not aware, and in that instance the owner must warn of the condition or make it reasonably safe. *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex.2003); *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 237 (Tex.1992); *Tennison,* 509 S.W.2d at 562. The licensee must prove that the owner had actual and not merely constructive knowledge of the danger. *See Miller,* 102 S.W.3d at 709. And, the licensee must prove that she was not aware of the dangerous condition. *See id.*

If the evidence when taken in a light that is most favorable to the verdict establishes nothing more than that the County had knowledge that a dangerous condition *might develop,* then the evidence is insufficient to establish that the County had actual knowledge that an unreasonably dangerous condition existed at the time. *See City of Corsicana v. Stewart,* 249 S.W.3d 412, 414–15 (Tex.2008). Circumstantial evidence, however, may establish actual knowledge when it " 'either directly or by reasonable inference' " supports that conclusion. *Id.* at 415 (quoting *State v. Gonzalez,* 82 S.W.3d 322, 330 (Tex.2002)); *see Reyes v. City of Laredo,* 335 S.W.3d 605, 608 (Tex.2010) (" '[T]he actual knowledge required for liability is of the dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition can develop over time.' ") (quoting *City of Dallas v. Thompson,* 210 S.W.3d 601, 603 (Tex.2006)).

Akins did not allege that the County injured her in a willful and wanton or grossly negligent manner. Rather, she alleged that the County had actual knowledge that the floor was wet and that it failed to warn her or make the unreasonably dangerous condition safe. The law does not require the premises owner to warn a licensee of a condition that was perceptible to her, or the existence of which can be inferred from facts within her present or past knowledge. *See Miller,* 102 S.W.3d at 709. "[A] licensee is not entitled to expect that the possessor [of land] will warn him of conditions that are perceptible to him, or the existence of which can be inferred from facts within his present or past knowledge." *Lower Neches Valley Auth. v. Murphy,* 536 S.W.2d 561, 564 (Tex.1976).

It is uncontroverted that Akins, a Mid-States employee, had worked at the jail for almost a full year prior to her fall. There was no dispute that the hallway floor in question was mopped by inmates at least twice a day. Akins testified at trial that before she fell she actually observed the inmates mopping the floor within fifteen to twenty feet of where she fell. According to Akins, as she walked out of the doorway into the hall she actually spoke to Officer Scott who was supervising the inmates who were mopping, and Akins said she could see something was on the floor where they were mopping.

Q. Okay. And in addition to seeing the trustees mopping and knowing that's what Ms. Scott always did, could you actually see water on the floor down here (indicating) where they were mopping?

A. I seen something on the floor.

Akins agreed that she had training regarding keeping floors dry and clean in the areas where she worked, and she had knowledge that someone might slip down on a wet floor.

Q. All right. Under Mid–States' contract, it was your duty as the supervisor to not only keep this room here (indicating easel) clean but dry?

A. Correct.

Q. Because Mid–States is aware that wet floors, with a thousand people

running around in a facility like that, somebody might slip down?

A. Correct.

Q. And that's why they made it a point—that the County made it a point that the floors were to remain dry under your supervision?

A. Correct.

Even assuming that the floor was wet at the time in question as a result of the mopping, that the wet floor was an unreasonably dangerous condition, and that the County had actual knowledge of the danger at the time of the accident, the law does not require the County to warn Akins, a licensee, of a condition or danger that was perceptible to her, or the existence of which can be inferred from facts within her present or past knowledge. *See Miller*, 102 S.W.3d at 709; *Murphy*, 536 S.W.2d at 564. The majority maintains that the fact that "Akins observed mopping and a shiny floor twenty feet away is not evidence that she knew the floor directly in front of her had been mopped and was also wet." The majority states that "[a]t most Akins's past and present knowledge could only allow her to infer that the floor might possibly be wet due to mopping." Notably, the same might also be stated as to the lack of actual knowledge held by the County. Nevertheless, the majority has misapplied the applicable legal standard to this element of Akins's claim.

While constructive knowledge of a possible danger does not suffice to establish "actual knowledge" on the part of the County, Akins, as a licensee, is imputed with knowledge of conditions perceptible to her, or that may be inferred from facts within her knowledge. *Miller*, 102 S.W.3d at 709 (citing *Murphy*, 536 S.W.2d at 564)). "[A] licensor owes no duty to a licensee so long as the evidence conclusively estab-

lishes the licensee perceived the alleged dangerous condition." *Id.*

Akins was aware of the practice of the jail in mopping the floors, as well as the danger of wet floors. She admitted she personally observed the inmates mopping the hallway within fifteen to twenty feet from her, and the evidence was uncontroverted that the bucket used by the mopping crew had a wet floor warning depicted on the bucket. By her own admission, she knew, either from facts within her then-present or past knowledge, of the danger. *See Miller*, 102 S.W.3d at 709; *San Jacinto River Auth. v. Simmons*, 167 S.W.3d 603, 610 (Tex.App.–Beaumont 2005, no pet.) (employee who had worked at the facility for several years was aware at the time he slipped and fell that there was biosolid material that could possibly collect and potentially make the area slippery, therefore "by his own admission, the possibility of an excessively slippery work-area on the day of the accident [was] well-known to [him], or could have been inferred by him from facts within his then-present or past knowledge[,]" and it barred his recovery); *City of Deer Park v. Hawkins*, No. 14–13–00695–CV, 2014 WL 953427, at *1, *2–5, 2014 Tex.App. LEXIS 2687, at **1–2, 6–11 (Tex.App.–Houston [14th Dist.] March 11, 2014, pet. denied) (licensee who fell into City trash bin testified that he knew that it was open and obvious that if someone fell into the bin they would fall fifteen feet and be injured, and the licensee's claim was barred because he could not prove he did not know of the dangerous condition); *Tex. Dep't of Transp. v. Bowen*, No. 14–09–00968–CV, 2011 WL 1045454, at *1–2, *3–4, 2011 Tex. App. LEXIS 2103, at **1–4, 8–11 (Tex. App.–Houston [14th Dist.] Mar. 24, 2011, no pet.) (Texas Department of Transportation owed no duty to warn or make condition reasonably safe where evidence conclusively established motorcycle rider,

who testified that she had repeatedly travelled through the intersection both as a driver and a passenger and in the past avoided the left lane near the intersection because the incline was less severe, knew of the dangerous condition or it could have been inferred that she knew from her then-present or past knowledge); *Nunley v. Tyler County*, No. 09–06–049–CV, 2007 WL 2002913, at \*2, 2007 Tex.App. LEXIS 5425, at \*\*6–7 (Tex.App.–Beaumont July 12, 2007, no pet.) (inmate had actual knowledge of the dangerous condition because she knew water collected outside the shower stalls and she and other inmates had even complained to the County about the wet floor); *San Antonio State Hosp. v. Guerrero*, No. 04–06–00050–CV, 2006 WL 3779790, at \*2, \*3–4, 2006 Tex.App. LEXIS 11021, at \*\*5–6, 9–14 (Tex.App.–San Antonio Dec. 27, 2006, no pet.) (testimony from worker that she had knowledge from past experience that the floor would get wet from "time to time" from condensation and of the possibility of a slippery floor established, as a matter of law, that the worker had actual knowledge of dangerous condition that caused her injury and the hospital where she worked was entitled to immunity).

## Conclusion

There is legally insufficient evidence in the appellate record to support the jury's finding that Akins did not have actual knowledge of the danger. To the contrary, the evidence conclusively established that Akins had knowledge of the danger. Therefore, I would reverse and render judgment in favor of the County. *See Miller*, 102 S.W.3d at 709.